IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

     v.

                                    Criminal No. 3:22cr87 (DJN)

FRANKLIN JEROME COLEMAN, JR.,
     Defendant.

## MEMORANDUM OPINION

This matter comes before the Court following Franklin Jerome Coleman, Jr.'s ("Defendant") Motion to Dismiss the Indictment (ECF No. 17) ("Def. Mot."). The Government indicted Defendant under 18 U.S.C. § 922(g)(1), which prohibits felons from possessing either arms or ammunition. Defendant brings facial and as-applied challenges to this statute and bases his Motion to Dismiss on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), asserting that the statute violates his Second Amendment rights. For the reasons stated below, the Defendant's Motion will be DENIED.[1]

## I.    FACTUAL BACKGROUND

On May 12, 2021, officers from the Petersburg Bureau of Police were searching for Defendant, who had outstanding warrants for his arrest. (Def. Mot. at 2.) Eventually, the officers came across a man who identified himself as Defendant. (*Id.*) At this time, the officers noticed that Defendant had his hand in his coat pocket. (*Id.*) The officers subsequently restrained Defendant and conducted a search incident to arrest, during which they discovered that Defendant was in possession of a loaded firearm and cocaine. At the time of this arrest,

---

[1]    The Court dispenses with oral argument as it would not aid in the decisional process. E.D. Va. Local Rule 47(J).

Defendant was a convicted felon. (*Id.*) Accordingly, Defendant was charged with violating 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm and ammunition. A grand jury returned an indictment against Defendant on June 21, 2023, (ECF No. 1). On August 25, 2023, Defendant moved to dismiss this indictment on the grounds that the indictment represents an unconstitutional infringement on his Second Amendment right to bear arms in light of the Supreme Court's recent *Bruen* opinion. (Def. Mot. at 1.)

## II.   STANDARD OF REVIEW

An indictment premised on a defendant having violated a statute that is unconstitutional either facially or as applied must be dismissed. *United States v. Riley*, 635 F. Supp. 3d 411, 415 (E.D. Va. 2022). A defendant may object to an allegedly defective indictment "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). "[W]here the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts," the motion stands ripe for consideration. *United States v. Horma*, 2018 WL 4214136, at *5 (E.D. Va. 2018). "[A] motion to dismiss the indictment is procedurally proper" provided that "the parties do not dispute the relevant facts and the defendant has alleged 'an infirmity of law in the prosecution,'" such as "an unconstitutional statute." *Riley*, 635 F. Supp. 3d at 416. Because Defendant contends that he has been indicted under an unconstitutional statute and the Government does not dispute the relevant facts in its response, Defendant meets these requirements. Accordingly, the constitutionality of 18 U.S.C. § 922(g)(1), more commonly known as the felon-in-possession statute, comes properly before the Court.[2]

---

[2] The Court offered the parties the opportunity to introduce evidence during an evidentiary hearing. (ECF No. 16). Both sides rejected the Court's overture. (Def. Mot. at 17–18); (ECF No. 18) ("Resp.").

### III.   ANALYSIS

In *Bruen*, the Supreme Court developed "a new framework for analyzing restrictions on the possession of firearms." *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023). This new framework rejects any "means-end" approaches to reviewing the constitutionality of regulations burdening the right to bear arms. *Bruen*, 142 S. Ct. at 2125. The Court clarified that lower courts must first determine if the Constitution's text protects the conduct and then, if so, determine whether a historical analogue for the modern regulation exists. *Id.* at 2126. Defendants nationwide have used this new test to challenge indictments brought under the felon-in-possession statute, which forbids those convicted of offenses punishable by imprisonment of one year or more from shipping, possessing or receiving any firearm or ammunition. 18 U.S.C. § 922(g)(1). Nevertheless, as the Government noted in their response, courts have stood in near unanimity in finding § 922(g)(1) constitutional under *Bruen*'s "text-and-history" approach, despite traveling different routes to arrive at that end. *See* (ECF No. 18 at Appendix A) (collecting over 172 cases nationwide upholding § 922(g)(1) against facial and as-applied challenges) ("Resp.").

This Court joins the overwhelming majority of courts that have upheld § 922(g)(1)'s constitutionality. While convicted felons fall within the plain text of the Second Amendment, there exists a sufficiently robust history of disarming those deemed dangerous to society, like felons, to justify the statute's constitutionality under *Bruen*. This holds true regardless of whether the nature of the predicate felony involves violence. Accordingly, the Court holds that

§ 922(g)(1) is constitutional facially and as applied to Defendant, who has committed only a single nonviolent felony.[3]  Therefore, the Court will deny Defendant's motion.

### A. *Bruen*'s Effect on Fourth Circuit Second Amendment Precedent

This Court does not address Defendant's claim on a blank slate.  As both the Government, (Resp. at 7), and Defendant note, (ECF No. 19 at 6) ("Reply"), the Fourth Circuit upheld § 922(g)(1)'s constitutionality in a trio of cases flowing from *District of Columbia v. Heller*, 554 U.S. 570 (2008), which described the statute as "presumptively lawful." 554 U.S. at 627 n.6.  The Government suggests that the Fourth Circuit cases upholding § 922(g)(1)'s constitutionality remain binding on this Court and end the matter.  (Resp. at 7–8); *see United States v. Lane*, 2023 WL 5663084, at *7 (E.D. Va. Aug. 31, 2023) (holding that Fourth Circuit precedent survives *Bruen*).  But as Defendant points out, the leading Fourth Circuit case, *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), and its progeny, *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) and *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), created a test that combines a historical inquiry with means-end scrutiny.  (Def. Mot. at 4.)  However, the Supreme Court in *Bruen* held that its precedent "do[es] not support a second step that applies means-end scrutiny in the Second Amendment context," putting into question the continuing vitality of Fourth Circuit precedent on the issue.  *Bruen*, 142 S. Ct. at 2118

Of course, Fourth Circuit precedent remains binding on this Court unless that precedent is contrary to or limited by intervening Supreme Court precedent.  *See Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 352 (4th Cir. 2023) ("absent contrary law from an en banc or Supreme Court decision," Fourth Circuit precedent remains binding); *United States v. Brown*, 67 F.4th 200, 212

---

[3]     Defendant's sole felony conviction involved the receipt of stolen property worth $500 or more. (Def. Mot. at 17.)

(4th Cir. 2023) ("Until the Supreme Court . . . limits or overrules [Fourth Circuit precedent], we are bound to apply it."). That said, the Fourth Circuit has yet to clearly define when its jurisprudence is "contrary" to or "limited" by Supreme Court precedent. Because the definitions of these thresholds are not self-evident, the Court looks outward to inform those standards.

The D.C. Circuit has noted that once the Supreme Court adopts "a rule, test, standard, or interpretation . . . that same rule, test, standard, or interpretation must be used by lower courts in later cases." *United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring). Indeed, a "mechanical mandate" exists to apply the Supreme Court's commands if they stand in tension with circuit precedent. *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). When the Supreme Court issues an opinion, "it is not only the result but also those *portions* necessary to that result by which [lower courts are] bound." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) (emphasis added). With these standards in mind, the Court considers the interaction between the Fourth Circuit's precedent on the Second Amendment and the Supreme Court's recent opinion in *Bruen* to determine whether the Fourth Circuit's precedent remains binding.

       i.    The Fourth Circuit's pre-*Bruen* precedent.

The leading Fourth Circuit cases that both Defendant, (Reply at 6), and the Government, (Resp. at 8), claim support their respective positions consist of the trio of *Chester*, *Moore* and *Pruess*. In *Chester*, which came on the heels of the Supreme Court's rulings in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Fourth Circuit adopted a straightforward two-step test that determined when gun regulations passed constitutional muster. 628 F.3d at 680. *Chester*'s first step involves a historical inquiry. Courts must determine "whether the conduct at issue," like felons possessing guns or ammunition, "was understood to be within the

scope of the [Second Amendment] at the time of ratification.  If it was not, then the challenged

law is valid." 628 F.3d at 681.  If the regulated conduct was understood to be within the Second

Amendment at the time of its ratification, then *Chester*'s second step requires applying means-

end scrutiny.  *Id.*  The Fourth Circuit's test does not consult the text of the Second Amendment,

but rather only its historical application.

From *Chester* came the two other Fourth Circuit cases relevant here — *Pruess* and

*Moore.*  In both, the Fourth Circuit reviewed the constitutionality of the statute at issue in this

case:  18 U.S.C. § 922(g)(1) — the right of a felon to bear arms or ammunition.  Both described

§ 922(g)(1) as presumptively constitutional, citing language from the Supreme Court in *Heller*,

and upheld the statute facially and as applied to both violent and nonviolent felons after applying

a truncated version of *Chester*'s two-step test.  *Pruess*, 703 F.3d at 246 n.3.  Neither the *Moore*

nor *Pruess* courts engaged in a textual inquiry to determine if felons were protected by the

Second Amendment, instead resting their holdings on historical grounds and Supreme Court

precedent that indicated that regulations like the felon-in-possession statute were longstanding

and therefore constitutional.  *Pruess*, 703 F.3d at 245–46.

These holdings drew largely from language in *Heller*, which likewise relied on a

historical rather than textual understanding of the Second Amendment's scope when describing

§ 922(g)(1)'s presumptive constitutionality.  *See Bruen*, 142 S. Ct. at 2128 (explaining that the

*Heller* Court "relied on the *historical* understanding of the [Second] Amendment to demark the

limits on the exercise of that right") (emphasis added).  This line of cases thus represents the

prevailing test for Second Amendment challenges in the Fourth Circuit:  first, look to history to

determine if the regulation at issue stands presumptively constitutional.  And second, if history

protects the conduct, apply means-end scrutiny.  With the Fourth Circuit's precedent on the issue

clarified, the Court now turns to analyzing the test for Second Amendment challenges adopted by the Supreme Court in *Bruen*.

        ii.    Reviewing *Bruen*'s "Text-and-History" framework.

Both Defendant and the Government agree on the *Bruen* test's contours despite disagreeing on its implications for this case. In *Bruen*, the Supreme Court clearly articulated how lower courts ought to determine the constitutionality of regulations touching on the right of the people to bear arms. At step one, *Bruen* requires interpreting the Second Amendment's "plain text." 142 S. Ct. at 2129. If the Second Amendment's text covers the regulated conduct, then that conduct is presumptively protected (and the regulation thus presumptively unconstitutional), and the reviewing court must proceed to step two. At step two, *Bruen* calls for a historical inquiry. Here, a challenged regulation is constitutional only if the Government can rebut the presumption of unconstitutionality by showing that the regulation at issue "is consistent with the Nation's historical tradition of firearm regulation." *Id.* If the Government shows that the regulation has "a well-established and representative historical analogue," then it has rebutted the presumption and the regulation survives. *Id.* at 2133.

        iii.    Where the Fourth Circuit's Second Amendment precedent stands after *Bruen*.

With both the Fourth Circuit's and Supreme Court's Second Amendment jurisprudence juxtaposed, the Court now considers whether *Chester*'s two-step test, as interpreted by *Moore* and *Pruess*, survives *Bruen*. The Court finds that it does not, in accordance with other circuits that have found analyses identical to *Chester* "obsolete" after *Bruen* categorically rejected tests calling for means-end scrutiny. *See United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023) (holding that Fifth Circuit precedent identical to *Chester* was rendered "obsolete" by *Bruen*).

7

Under the *Chester-Moore* Fourth Circuit framework, courts must undertake a historical inquiry at step one. By contrast, *Bruen*'s first step requires reviewing the Amendment's plain text which, while guided by history, involves a predominantly textual inquiry. Indeed, *Chester* mentions text only twice, but not in reference to the Second Amendment's scope. And its progeny, *Moore* and *Pruess*, fail to even mention the word "text," let alone conduct a textual inquiry. Yet *Bruen* plainly states, over a dozen times, that step one of determining the constitutionality of a regulation touching on the Second Amendment must be guided by the Amendment's plain *text*. Moreover, the *Chester-Moore* framework calls for a second step — the application of means-end scrutiny — that the Supreme Court specifically rejected in both *Heller* and *Bruen*. *See Bruen*, 142 S. Ct. at 2129 ("[T]he Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny."). In sum, the Fourth Circuit's Second Amendment precedent involves a test that (1) employs a categorically different first step from the Supreme Court's test and (2) demands a standard of review that the Supreme Court specifically rejected. As such, the Supreme Court undermined, limited and specifically rejected the *Chester-Moore* Second Amendment case law. Therefore, it no longer constitutes binding precedent.

The case law predating *Bruen* bolsters the Court's finding that *Bruen* adopted a test that supersedes Fourth Circuit precedent upholding § 922(g)(1)'s constitutionality. *See Lane*, 2023 WL 5663084, at *3 (describing *Bruen* as "a new two-step test"). *Heller* stands most relevant here, as the Fourth Circuit heavily relied on it in the *Chester-Moore* line of cases. Specifically, the Fourth Circuit relied on dicta from *Heller* that described § 922(g)(1) as "presumptive[ly]

8

constitutional."[4] *See Lane*, 2023 WL 5663084, at *1 (describing *Moore* and *Pruess*'s analysis). This dictum described the "longstanding prohibition" against felons possessing firearms, rendering *Heller*'s proclamation as one reflecting a historical rather than textual understanding of the Second Amendment's scope. *Heller*, 554 U.S. at 626. Given the *Chester-Moore* case law's reliance on this language, the Court interprets those cases as grounding their respective holdings in the Second Amendment's history rather than its text. While those holdings are undoubtedly correct as a historical matter, the test adopted by the Supreme Court in *Bruen* requires consulting the text of the Amendment before a historical inquiry takes place. *See Rahimi*, 61 F.4th at 453 (observing that "*Bruen* fundamentally changed our analysis of laws that implicate the Second Amendment").

Courts have described this new analysis as the "clarifi[cation] and reiterat[ion], rather than [the modification]" of *Heller*'s constitutional ruling. *United States v. Ingram*, 623 F.Supp.3d 660, 663 (D.S.C. 2022). Thus, while this Court must apply the clarified and reiterated test crafted by the Supreme Court in *Bruen* to determine § 922(g)(1)'s constitutionality, the logic and reason underlying the Fourth Circuit's Second Amendment jurisprudence remains relevant, particularly as to its historical analysis demanded by *Bruen's* second step. Accordingly, the Court turns to *Bruen* — with the Fourth Circuit's precedent in mind — to determine the scope of Defendant's Second Amendment rights in the case at hand.

---

[4]     To be sure, that the Fourth Circuit relied on dicta does not generally render its holdings any less authoritative. *See Lane*, 2023 WL 5663084 at *6 n.6 (describing the difference between following Supreme Court dicta and following a Fourth Circuit holding that incorporates Supreme Court dicta). This Court diverges from the Fourth Circuit's prevailing test for determining the constitutionality of regulations touching on the right to bear arms solely because it was superseded by *Bruen*. *See* Part V.A of this opinion.

**B. Applying *Bruen*'s Two-Step "Text and History" Approach to Felon–in–Possession Laws**

At step one of *Bruen*'s Second Amendment test, courts consider only whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. If it does, *Bruen* holds that "the Constitution presumptively protects that conduct." *Id.* In this case, Defendant makes facial and as-applied challenges to § 922(g)(1), a statute that prohibits felons from keeping or bearing arms and ammunition. The threshold textual question implicated by the statute, as every other court to consider the issue has determined, asks whether "felons" fall within the scope of "the people" to whom the Second Amendment guarantees the right to bear arms. *See, e.g.*, *Range v. Att'y Gen. United States of America*, 69 F.4th 96, 98 (3d Cir. 2023); *Lane*, 2023 WL 5663084, at *14. If they do, then the felon-in-possession statute is constitutional only if the Government can justify "its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Based on the reasoning set forth below, the Court holds that while felons unambiguously fall within the scope of the Second Amendment's textual term of art, "the people," the felon-in-possession statute nevertheless remains constitutional facially and as applied to nonviolent felons, because it represents a "longstanding prohibition" — one consistent with this Nation's regulation of firearms. *Heller*, 554 U.S. at 626.

> i. The plain text of the Second Amendment, like every other amendment in the Bill of Rights, covers felons.

Many amendments of this Nation's Constitution confer its privileges upon "the people." The First Amendment protects the right of "the people" to assemble. The Second guarantees that "the people" may "keep and bear arms." The Fourth stands resolute in protecting "the people" from unreasonable searches and seizures effectuated by the state. And the Ninth and Tenth confirm that the rights of "the people" are not restricted only to those enumerated in the

Constitution.  The question before the Court at this juncture asks whether felons are part of "the people" for purposes of the Second Amendment.  The Government insists that "the people" referenced in the Second Amendment includes only "law-abiding citizens" and thus excludes felons, (Resp. at 14.), while Defendant argues otherwise. (Def. Mot. at 6.)  To be sure, courts nationwide have diverged on interpreting this term of art, "the people," and who falls within its scope. *Compare Range*, 69 F.4th at 98 (holding that felons are part of the Second Amendment's "the people"), *with Riley*, 635 F. Supp. 3d at 424 (holding the opposite); *Lane*, 2023 WL 5663084, at *7 (same).  That said, this Court respectfully declines to follow those courts holding that felons, because of their status, no longer find sanctum as part of "the people" protected by the Second Amendment.  This Court instead finds that felons unquestionably retain their membership within "the people" covered by the Second Amendment, just as they stay within "the people" of the First, Fourth, Ninth and Tenth Amendments, despite their status.

American citizens, and all others encompassed by "the people," do not surrender the rights guaranteed by the Bill of Rights due to a felony conviction.  Instead, a felony conviction subjects them to increased regulation and possible diminution of these rights, up to and including permanent disarmament.  Indeed, the Supreme Court in both *Heller* and *McDonald* made clear that this issue involves regulation, not dissolution, of the right at hand.  In *Heller*, the Court noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" — "the right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  554 U.S. at 626.  There exist certain circumstances, like becoming a felon, that justify limiting the scope of the right, but that opinion provides no support for removing felons from the Second Amendment's textual ambit.  Likewise, the Supreme Court's opinion in *McDonald* — where the Court described § 922(g)(1) as a "longstanding *regulatory*

11

measure" — further proves that the question, properly understood, is the extent to which felons' rights may be *regulated*, not whether they are excised from "the people" and the protections guaranteed by the Bill of Rights at the instant that they become a felon. 561 U.S. at 786 (emphasis added). To view this otherwise would lead to a slippery slope of forfeiture involving other rights protecting "the people," such as those set forth in the First and Fourth Amendments, that no court has ever sanctioned.

In arguing that felons fall outside the scope of "the people," the Government latches onto the fact that *Bruen* used the term "law-abiding citizen" twenty-one times, (Resp. at 14), which stems from *Heller*'s similar repetition of the phrase. In that opinion, the Supreme Court noted that "the people . . . unambiguously refers to all members of the *political community*." *Heller*, 554 U.S. at 2790 (emphasis added). The Government's syllogism then proceeds by interpreting the phrase "political community" as those able to exercise political rights, like voting. And because felons — a group not considered "law-abiding" — can constitutionally be denied their right to vote, it therefore follows from the Government's theory that felons fall outside of the "political community," and thus are beyond the scope of "the people" protected by the Second Amendment's text. (Resp. at 13.)

Defendant rejects the Government's interpretation for various reasons. First, the *Heller* Court also stated that the Second Amendment applies "to all members of the national community, not an unspecified subset," contradicting the Government's suggestion that the right belongs only to law-abiding members of the "political community." (Def. Mot. at 7.) Second, Defendant argues that the term "law-abiding," which the Government uses to define who falls within the scope of the Second Amendment, constitutes too ambiguous a term to be of value. (*Id.* at 8.) And third, Defendant contends that the Government's reading, which would require

understanding the same words, "the people," to possess different meanings in different amendments, makes little sense. (*Id.* at 11.) As noted, the Court agrees with Defendant and holds that the Constitution's plain text covers felons and non-felons alike, as is the case with every other provision in the Bill of Rights and the Constitution's subsequent amendments.

First, the Government's reliance on the Supreme Court's various references to "law-abiding" persons as support for its contention that felons fall outside the scope of the Second Amendment does not persuade this Court. A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution. *See Range*, 69 F.4th at 102 (the phrase "law-abiding, responsible citizens is as expansive as it is vague"). On this score, the Government cites to portions of the Supreme Court's opinion in *Heller* that support its position when read in isolation. (Resp. at 13.) However, when analyzed within their broader context, they fail to persuade the Court.

The Government suggests that the phrase used in *Heller* describing the Second Amendment as applying only to members of the "political community," (*Id.*), renders felons outside the scope of the Second Amendment entirely because the "political community" only covers "law-abiding" persons. However, the *Heller* Court was inconsistent when defining *who* fell within the Amendment's scope. After describing the Second Amendment as belonging to all those in the "political community" — the phrase on to which the Government latches — the Supreme Court conflated "political community" with the broader term, "national community":

> "'[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that 'the people' protected by the *Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments*, refers to a class of persons who are part of *a national community* or who have otherwise developed sufficient connection with this country to be considered part of that community."

13

*Heller*, 554 U.S. at 580 (emphasis added).  The Government does not address the *Heller* Court's inconsistency in defining who finds refuge within "the people," nor does the Government provide a rationale for interpreting "the people" to exclude felons in the Second Amendment, but not to exclude them from the First, Fourth, Ninth or Tenth Amendments, which likewise apply to "the people."

The *Heller* Court even went so far as to describe the Second Amendment as a right belonging "to all Americans." *Id.*  As to this, the Government argues that when describing the Second Amendment as belonging "to all Americans," the Court merely held that the right to bear arms constituted an individual rather than collective right, and not that the Second Amendment in fact applies to all Americans, including felons. (Resp. at 13.)  However, no circuit court has adopted the view construing *Heller*'s interpretation of the Second Amendment's text so narrowly, while multiple have found that the text's scope extends to felons. *Range*, 69 F.4th at 98; *Rahimi*, 61 F.4th at 452.[5]  Thus, while *Heller*'s "political community" language serves as a convenient hook to grasp onto, the paucity of definitional clarity and dearth of circuit support renders the Government's position, one that seeks to divest an entire class of persons of their constitutional rights, manifestly unpersuasive.

Second, as Defendant notes, (Def. Mot. at 8), reading "the people" in the Second Amendment to exclude felons would be out of step with every other constitutional provision that uses identical language. *See United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015)

---

[5]     The only circuits to consider 18 U.S.C. § 922(g)(1)'s constitutionality after *Bruen* are the Third, Eighth and Tenth Circuits.  In *Range*, 69 F.4th at 96, the Third Circuit held that felons are part of "the people" and struck down the statute as applied to a nonviolent felon.  In *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), the Eighth Circuit upheld the statute only on historical grounds and did not conduct a textual analysis.  And in *Vincent v. Garland*, 2023 WL 5988299 (10th Cir. 2023), the Tenth Circuit relied on its own precedent upholding § 922(g)(1)'s constitutionality and did not apply *Bruen*'s framework.

("'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights"). The Government does not suggest felons are categorically excluded from "the people" entitled to the protections of the First, Fourth, Ninth, or Tenth Amendments. Nor should the Government. Individuals are not jettisoned from the Constitution's text by virtue of being deemed a felon. Rather, certain regulations restricting the constitutional rights of felons are permissible because they apply to felons, who have historically been unable to benefit from the full scope of the Constitution's guarantees, not because the Constitution itself no longer covers them. It is not only constitutionally untenable but also fraught with danger to suggest that, like a light, the Constitution's protections turn off once one engages in conduct that a legislature has determined constitutes a felony.

The constitutionality of regulations disarming felons therefore does not hinge on whether felons fall within the ambit of the Constitution's text. Rather, felons, as members of "the people," possess the rights set forth in the Bill of Rights and subsequent amendments but — as with other amendments that protect "the people" — can forfeit their ability to exercise the full breadth of those rights if they commit a felony. Support for this understanding is reflected most clearly by case law concerning the scope of the First and Fourth Amendments which, like the Second Amendment, protect "the people."

In *United States v. Verdugo-Urquidez*, the Supreme Court held that "the people" in the Fourth Amendment applied "to a class of persons who are part of a *national community*." 494 U.S. 259, 265 (1990) (emphasis added). In reaching this conclusion, the *Verdugo-Urquidez* Court interpreted "the people" identically across the many Amendments in which it is located. The Supreme Court determined that whether one constitutes a part of the "national community," and therefore part of "the people," turned not on felony status but instead on one's voluntary

15

connections to the United States. *Id.* at 274–75.  Notably, the *Heller* Court later adopted

*Verdugo-Urquidez*'s interpretation of these words, indicating that the *Verdugo-Urquidez* Court's

interpretation of "the people" applies with equal force across the Bill of Rights.  *Heller*, 554 U.S.

at 580.

    The Government's position in this case, which contends that the scope of "the people"

does in fact turn on felony status, ignores *Verdugo-Urquidez* and if adopted in the Fourth

Amendment context would require concluding that felons lack Fourth Amendment rights en toto,

an outcome that obviously cannot stand.  Although the Government persists that this need not be

the logical result of its position, because the same words, "the people," can be read differently

depending on the Amendment under review, that method of constitutional interpretation

contravenes both the Supreme Court's language from *Heller* and *Verdugo-Urquidez* and basic

canons of textual interpretation.  (Resp. at 17–18.)

    That the Fourth Amendment still applies even once one becomes a felon, albeit with less

force, further supports the Court's conclusion that felons are part of "the people" across the Bill

of Rights.  For instance, when felons are on probation, the Fourth Amendment provides less

robust protection against searches, because probation "significantly diminishe[s] a probationer's

reasonable expectation of privacy.  *United States v. Knight*, 534 U.S. 112, 119–120 (2001);

*United States v. Hill*, 776 F.3d 243, 248 (4th Cir. 2015).  This results in "privacy intrusions that

would not otherwise be tolerated under the Fourth Amendment."  *Samson v. California*, 547 U.S.

843, 853 (2006) (cleaned up).  Importantly, intrusions into a probationer's privacy are

nevertheless governed by reasonableness, the touchstone of the Fourth Amendment.  *Id.* at 848–

49.  That felons are protected from searches that fall short of the Fourth Amendment's

reasonableness standard reflects a ready understanding that courts interpret "the people"

protected by the Fourth Amendment to include felons. However, like the Second Amendment, the guarantees of the Fourth Amendment may be circumscribed if circumstances — like felony status — are implicated.

So too with the First Amendment, which likewise protects "the people." For example, courts regularly impose conditions of supervised release that would constitute unconstitutional abridgements of the First Amendment if they were applied to law-abiding citizens. Take, for instance, the condition that those suspected of having gang affiliations often are validly prohibited from associating with other gang members. *United States v. Evans*, 883 F.3d 1154, 1161 (9th Cir. 2018). This condition is facially constitutional not because those suspected of having gang affiliations fall outside the scope of "the people" protected by the First Amendment, but because those on supervised release lose the full breadth of the First Amendment's protections, because they broke the law.

Prisoners are likewise unable to take full advantage of the First Amendment's guarantees. As the Supreme Court recognized, an "inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner." *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129 (1977) (quotations omitted). The Court did not announce, however, that prisoners necessarily forfeit the entirely of their First Amendment protections, only that such protections may be curtailed to the extent curtailment does not offend the Constitution. For instance, prisoners may have reduced access to the media and their ability to speak with the press can be restricted, *id.* at 828, and they may not even be able to receive hardcover books, *Bell v. Wolfish*, 441 U.S. 520, 550 (1979). No court in this Nation's history, however, has held that restrictions like these are permissible because lawbreakers, by virtue of their disfavored status, forfeit their membership as part of "the people" to whom the First Amendment affords its

17

protections.  Rather, courts undertake scrutinizing analyses to determine whether a given policy impermissibly regulates a prisoner's First Amendment right.  That courts undertake these analyses reflects the commonsense assumption that felons are part of "the people."  If they were not, there would be little reason for courts to review whether prison policies represent an unconstitutional limitation on a prisoners' First Amendment rights, as that privilege protects only "the people." *Pell v. Procunier*, 417 U.S. 817, 822–28 (1974).

The Government also contends that because felons can be denied their right to vote, a right guaranteed to "the people," it follows that felons are not covered by the Second Amendment, which likewise extends to "the people."  (Resp. at 18.); U.S. CONST. art. I, § 2. However, this commonly made assertion confuses what occurs at the constitutional level when legislatures delimit felons' constitutional rights.  As then-Judge Barrett described,

> "It is one thing to say that certain weapons or activities fall outside the scope of the right. It is another thing to say that certain people fall outside the Amendment's scope.  Arms and activities would always be in or out.  But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required."

*Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) (citations omitted). This Court adopts the wisdom of then-Judge Barrett's approach.  *Accord Range*, 69 F.4th at 102 ("We agree with . . . then-Judge Barrett's reasoning.").  The extent to which an individual can exercise their constitutional rights can be a function of historical context, as the Supreme Court aptly described in *Bruen*.  And in *Richardson v. Ramirez*, where the Supreme Court held that a California felon disenfranchisement law did not violate the Fourteenth Amendment's Equal Protection Clause, the Court likewise looked to "the historical understanding" of the Amendment in reaching its conclusion.  418 U.S. at 53.  But whether persons can be excised from the

Constitution and its protections by legislative decree is, as then-Judge Barrett recognized in *Kanter*, a different question entirely.

Indeed, the Government's suggestion that felon disenfranchisement supports reading "the people" to exclude felons supports Defendant's position more than its own. That states pass legislation disenfranchising felons in the first place indicates a ready understanding that felons fall within the scope of the "the people." If they were not within "the people," there would be no need for statutes that affirmatively disenfranchise felons. *See Kanter*, 919 F.3d at 453 ("[A] state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected.") (Barrett, J., dissenting). Likewise, if felons fell outside of the Constitution's text, they would not have the constitutional right to vote in the first instance, and states would therefore lack the ability to restore their right to vote. But states can restore felons' voting rights, and they have that power because felons are part of "the people."

These examples show that courts understand Constitutional language protecting "the people" applies irrespective of whether one has become a felon. Though felons and lawbreakers may have their constitutional protections regulated and diminished, this does not occur because they are removed from the Constitution's text. Rather, those rights may permissibly be circumscribed, because history, facts, and circumstances justify the limitation. To adopt the Government's position that felons are not part of "the people" would be to adopt an interpretation unsupported by how courts implicitly and explicitly interpret "the people" in each other instance that the Constitution uses identical language. The Court declines to do so and instead reads "the people" to retain the same meaning in each of the Amendments within which it is housed, an interpretation likewise supported by canons of statutory interpretation.

The third obstacle standing between the Government and the holding that it urges the Court to adopt comes from the canon of consistent meaning, which assumes that terms retain the same meaning each time that they are used. *Brown v. Gardner*, 513 U.S. 115, 118 (1994). The *Heller* Court adopted the assumption of consistent meaning when it referenced *Verdugo-Urquidez*'s analysis of "the people" and noted that "[its uses] sugges[t] that 'the people,' as used *across the Bill of Rights as well as in the preamble*, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265) (emphasis added). The Supreme Court did not distinguish between Amendments when it made this conclusion, instead applying its interpretation of "the people" in the Fourth Amendment to every other instance that the Constitution uses that term of art. Moreover, it is unlikely that the Framers themselves would have used identical language in Constitutional provisions passed at the same time if they intended the language's meanings to be contingent on the Amendment in which that language is located, further demonstrating the strength of adopting a consistent interpretation of "the people." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (recognizing that "identical words used in different parts of the same statute are generally presumed to have the same meaning").

Nor is there any indication that individuals in the Founding era would have interpreted the same words differently. The Constitution serves as the people's document, which requires interpretations of it to be guided by the fact that its "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Ordinarily, the same words, in the same text, deriving from the same historical era are understood by ordinary people to have the same

20

meaning.[6]  The Court can find no evidence, nor has it been provided any, indicating that individuals in the Founding era would have interpreted "the people" to have one definition in the First Amendment, another in the Second Amendment and yet a third definition in the Fourth Amendment, as would be required by the Government's theory.

Lastly, while the Court will engage in the predominant historical inquiry at step two of the test, the *Bruen* Court announced that the textual analysis should be "informed by history." 597 U.S. at 2118.  As such, this Court must bolster its recognition that felons are covered by the Second Amendment's text with historical support. *Id.*

When the Bill of Rights was ratified in 1791, felony crimes were few and far between. The first federal statute imposing imprisonment terms of one year or greater consisted of homicides, mayhem (cutting off someone's tongue or ears), misprision of felony, facilitating a prison break, destruction of judicial records, perjury, piracy and obstruction of dissection (taking the body of someone who had been executed).  Crimes Act of 1790, ch. 9 §§ 1-33, 1 Stat. 112. Common law felonies were even more circumscribed, consisting only of murder, rape, manslaughter, robbery, sodomy, larceny, arson, mayhem and burglary.  Wayne R. LaFave, CRIMINAL LAW § 2.1(b) (5th ed. 2010).  William Blackstone defined a felony as "an offense which occasions a total forfeiture of either lands, or goods, or both, at the common law, and to

---

[6]      The Supreme Court described this position aptly: "When we look to the names affixed to the articles of confederation, and the constitution; when we consider that the former, after being long discussed in congress, and approved by that body, was submitted to the state legislatures, who deliberated nearly four years, before its adoption, and that every word, phrase and sentence was fully discussed and most anxiously considered, it cannot be considered as a bold or rash assertion, that the framers of both instruments comprehended the language they used, said what they meant, meant what they said, and stamped upon their work an impress of intention, which they at least designed should be intelligible to all capacities."  *Briscoe v. Bank of Commonwealth of Kentucky*, 36 U.S. 257, 350 (1837).

which capital or other punishment may be superadded, according to the degree of guilt." 4

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 95 (Harper ed. 1854). Of

course, not all modern felonies require the total forfeiture of land or goods, nor do they render

the offender eligible for capital punishment.

These examples show that it is markedly easier to become a felon today than it was in the

Founding era. Considering this, if the Government's theory — that the Second Amendment's

coverage turns on felony status — were correct, then the scope of the Constitution's text would

have implicitly changed over the course of centuries, covering different persons depending on

whether the legislature of that era criminalized their conduct. *See Range*, 69 F.4th at 102–03

(noting that the Government's theory would "give[] legislatures unreviewable power to

manipulate the Second Amendment by choosing a label"). More yet, the Government's theory

would also lead to the implausible conclusion that the Second Amendment's coverage could

hinge on the state where the crime is committed, as some states punish conduct as felonies that

other states might only punish as a misdemeanor, or not at all.

The Court rejects the Government's view. Adopting its theory would contravene the

*Heller* Court's admonition to reject interpretations of the Second Amendment that vacillate over

time depending on legislative whim. 554 U.S. at 634–35 ("[c]onstitutional rights are enshrined

with the scope they were understood to have when the people adopted them . . . ."). Even more,

to hold otherwise would permit Congress and state legislatures to de facto amend the

Constitution themselves, thus circumventing the Constitution's amendment process by legislative

fiat. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from

Possessing Arms*, 20 WYO. L. REV. 249, 254 (2020). "Neither *Heller* nor *Bruen* countenances

such a malleable scope of the Second Amendment's protections." *Rahimi*, 61 F.4th at 453.

22

Placing felons outside the scope of the Second Amendment would require giving different meaning to the same words and phrases in the Constitution, resulting in felons being part of "the people" protected by the First, Fourth, Ninth and Tenth Amendments while simultaneously being excluded from "the people" protected by the Second Amendment. Given the deliberative process that crafted the Constitution, that era's history and Supreme Court precedent contravening such a reading, this Court declines adopting that interpretive approach. The Government fails to supply the Court with the decidedly clear support that it requires before it would entertain excising an entire class of persons from the protections delineated in the Bill of Rights. In fact, as reviewed, a bevy of Supreme Court precedent and a common-sense interpretation of the Constitution weigh firmly in favor of the Court's holding that "the people" to whom the Second Amendment's affords its protections includes felons.

        ii.    The overwhelming weight of Supreme Court and historical precedent confirm that prohibiting felons from bearing arms is consistent with American history and tradition.

Because this Court finds that Defendant and his conduct[7] are protected by the Constitution, it moves to step two of the *Bruen* analysis. At this juncture, Defendant's conduct stands presumptively protected and cannot be regulated unless the Government "justif[ies] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" — that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2130, 2137. An identical match between the modern and historical regulation need not occur. *Id.* at 2133.

---

[7]    The regulated conduct involves bearing arms or ammunition while also being a felon. As reviewed, such conduct stands protected by the Second Amendment's text.

The historical analysis turns on the level of generality that applies to the regulated conduct. The Government proposes that it need only show that there exists a history of "disarming persons whom legislatures have found are not law-abiding, responsible citizens," (Resp. at 29), while Defendant suggests that the historical inquiry must show a tradition of "permanently den[ying] firearms to [felons or] some group very similar to felons," (Def. Mot. at 12.) Even if this Court adopts Defendant's preferred level of generality, which does not appear to be entirely in tension with the Government's position, the weight of the historical record demonstrates the existence of a practice sufficiently similar to permanently denying felons or similar groups of their Second Amendment rights to justify § 922(g)(1)'s constitutionality.

After determining that the regulation under review consists of permanently disarming felons or similar groups, the Court turns to determining how close the fit must be between this regulation and a historical analogue. The *Bruen* Court provided that regulations bearing on "unprecedented social concerns or dramatic technological changes" would require only a "relevantly similar" relationship between the historical and modern regulations. However, when a concern has been longstanding, the historical analogue must be "distinctly similar" to its modern counterpart. *Bruen*, 142 S. Ct. at 2131. As Defendant notes, for as long as law has categorized certain offenders as felons, so too has there been social anxiety about the type of conduct these individuals may engage in. (Def. Mot. at 12.) Understanding the regulation of felons bearing arms in this way would require the Government to produce a "distinctly similar" historical analogue. That said, the Court recognizes that the evolution of firearm technology and the ready access to weapons markedly more dangerous than those in the Founding era may constitute the "unprecedented social concerns or dramatic technological changes" that would justify applying the more relaxed "relevantly similar" standard. *Bruen*, 142 S. Ct. at 2131.

24

Regardless of which standard the Court adopts, this Court holds that the Government carries its burden, because it establishes even the more stringent "distinctly relevant" standard.

The *Bruen* Court provided guidance on how to weigh historical evidence when determining whether the Government has carried its burden. "How" the regulation applies and "why" (what triggers the regulation) it is imposed represent central considerations in this inquiry. *Id.* at 2133. And the closer that the historical evidence exists to the year 1791, the more weight that it carries in this analysis. *Id.* at 2136–37. A throughline from the English Crown to Blackstone's writings carries greater weight than isolated instances of regulation in the fourteenth century. *Id.* at 2136. Importantly, courts must be wary about "giving post-enactment history more weight than it can rightly bear." *Id.*

The Government cites pre-Founding, Founding and post-Founding era historical support to justify disarming felons. (Resp. at 19–28.) Defendant contends that such evidence fails to rebut the presumption, because no Founding-era laws depriving felons or similar groups of their right to bear arms existed. (Def. Mot. at 12–13.) However, Defendant's position appears to not only be incorrect as a matter of history, but also fails to demonstrate why this Court should deviate from the Fourth Circuit's recognition that "[p]laced in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." (Resp. at 25, citing *United States v. Carter*, 669, F.3d 411, 415 (4th Cir. 2012)); *accord Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."), *abrogated on other grounds by Bruen.*

Besides on-point holdings from the Fourth Circuit describing the longstanding tradition of disarming those the legislature deems dangerous, Founding-era regulations disarming groups like felons exist in spades.  During the Revolutionary War, the Continental Congress recommended, and most states enacted, regulations disarming those deemed injurious to the interests of the then-burgeoning American Republic.  (Resp. at 29 (citing 4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 205 (Worthington Chauncey Ford ed., 1906)).)  In the decades after ratification, many states adopted regulations infringing on the right of felons, and lawbreakers like felons, to bear arms.  (Resp. at 31 n.18 (collecting statutes).)  Other courts have pointed to attainder statutes, which disarmed the "disaffected" and "delinquents" during the late eighteenth century and early nineteenth century, as a historical analogue to the modern practice of disarming felons.  *United States v. Coombes*, 629 F. Supp. 3d 1149, 1157 (N.D. Okla. 2022). These examples show a historical pattern of substantial and often complete infringement on the Second Amendment rights of felons and persons like felons, a position supported both by courts[8] and historians.[9]  Thus, while these historical examples are not identical to § 922(g)(1), they are "distinctly similar" in that they completely negate the Second Amendment rights (the "how") of a group identified by the legislature as lawbreaking or dangerous (the "why").  Accordingly, the Government has carried its burden.

---

[8]      *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023); *United States v. Riley*, 635 F. Supp. 3d 411 (E.D. Va. 2022).

[9]      Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 265 (2020) ("as was the case with all disarmaments during the colonial period, the justification was always that those being disarmed were dangerous"); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983) ("it [does not] seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them").

The Court now considers Defendant's as-applied challenge.  Although Defendant is a nonviolent felon,[10] sufficient historical support exists to uphold § 922(g)(1) as applied.  *See Riley*, 635 F. Supp. 3d at 427 (recognizing that "Founding-era precedent also exists for disarming nonviolent individuals"); *United States v. Jackson*, 69 F.4th at 502 (upholding § 922(g)(1) as to a nonviolent felon); *Medina v. Whitaker,* 913 F.3d 152, 158–59 (D.C. Cir. 2019) (same).  For instance, in the colonial era, multiple states disarmed individuals, because they would not swear a loyalty oath to the United States.  (Resp. at 29); *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004)).  Other courts have refused the distinction between violent and nonviolent felons, describing state-sanctioned disarmament as "merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *United States v. Yancey*, 621 F. 3d 681, 684 (7th Cir. 2010); *see also* Don B. Kates, Jr.*, The Second Amendment: A Dialogue,* 49 LAW & CONTEMP. PROBS. 143, 146 (1986) ("[T]he right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) . . . .").  Indeed, the mere "disturbance of the peace" once served as grounds for disarmament.  (Resp. at 16 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & PUB. POL'Y 695, 716 (2009)).)  This evidence reflects a history that rejects the distinction between violent and nonviolent status when determining the lawfulness of infringing on the Second Amendment.

In considering these decisions and the authority described, the Court recognizes the ongoing debate among historians about the extent to which the right to bear arms in the Founding

---

[10]     Defendant's sole felony conviction involved the receipt of stolen property worth $500 or more. (Def. Mot. at 17.)

period turned on felony status. *See Atkinson v. Garland*, 70 F.4th at 1025 ("the historical

analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy");

*Riley*, 635 F. Supp. at 427 (noting the difficulty of the historical analysis). Nevertheless, support

for this position among courts and scholars serves as persuasive evidence that more than just

identifiably violent individuals could forfeit their Second Amendment rights. For these reasons,

the Court holds that § 922(g)(1) remains constitutional as to violent and nonviolent felons alike

and will deny Defendant's as-applied challenge.

As a final word on the historical inquiry, the Court need look no further than the Supreme

Court itself. In *Heller*, the Supreme Court described § 922(g)(1) as "longstanding" and

"presumptively lawful." 554 U.S. at 626, 627 n.26. The Court went further yet, noting that

"nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons." 554 U.S. at 626. The Supreme Court again emphasized that

there was no doubt about the § 922(g)(1)'s constitutionality in *McDonald v. City of Chicago*, 561

U.S. 742, 786 (2010). And in *Bruen*, Justice Kavanaugh, joined by Chief Justice Roberts, wrote

separately to reiterate that the presumptive lawfulness of § 922(g)(1) was not disturbed by the

Court's opinion. 142 S. Ct. at 2163 (Kavanaugh, J., concurring).

Thus, the Government has borne its historical burden by showing that a longstanding

tradition, one that the Fourth Circuit itself described as robust, of disarming both violent and

nonviolent felons exist. *Carter*, 669 F.3d at 415. This is a position adopted by circuit and

district courts nationwide. And if this were not enough, this Court heeds the words of the

Supreme Court which, at every opportunity, has confirmed § 922(g)(1)'s constitutionality. 554

U.S. at 626; 561 U.S. at 786; 124 S. Ct. at 2163 (Kavanaugh, J., concurring).

## IV.   **CONCLUSION**

The Fourth Circuit precedent governing Second Amendment challenges applies a test different in kind and specifically rejected by the test that the Supreme Court delineated in *Bruen*. Accordingly, the Court applies the Supreme Court's "text-and-history" approach and finds that felons, while plainly within the Second Amendment's text, have historically experienced disarmament.  Accordingly, the Court holds that 18 U.S.C. § 922(g)(1) constitutes a valid restriction on the Second Amendment right of violent and nonviolent felons to keep and bear arms.  The Court thus stands with the vast majority of district courts, circuit courts and scholars that have likewise found that the "longstanding" prohibitions on the right of felons to bear arms and ammunition renders 18 U.S.C. § 922(g)(1) constitutional.  Consequently, for the reasons stated, Defendant's Motion to Dismiss the Indictment (ECF No. 17) will be DENIED.

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated:  October 12, 2023

## APPENDIX A

**The following is a list of over 170 district court opinions that have rejected a post-*Bruen* challenge to the constitutionality of Section 922(g)(1):**

1. *United States v. Lane*, No. 3:23cr62, 2023 WL 5663084 (E.D. Va. Aug. 31, 2023);
2. *United States v. Locket*, No. 22-cr-72, 2023 WL 5153549 (S.D. Tex. Aug. 10, 2023);
3. *United States v. Carloss*, No. 23-cr-86, 2023 WL 5152623 (E.D. Okla. Aug. 10, 2023);
4. *United States v. Hatch*, No. 23-cr-1201, 2023 WL 5020270 (S.D. Cal. Aug. 7, 2023);
5. *United States v. Webb*, No. 4:22-cr-75, 2023 WL 4977932) (D. Utah Aug. 3, 2023);
6. *United States v. Andrews*, No. 18-cr-149, 2023 WL 4974766 (D. Minn. Aug. 3, 2023);
7. *United States v. Giglio*, No. 1:23-cr-39, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023);
8. *United States v. Bolling*, No. 2:21-cr-87, 2023 WL 4874482 (S.D.W. Va. July 31, 2023);
9. *United States v. Schnur*, No. 1:23-cr-65, 2023 WL 4881383 (S.D. Miss. July 31, 2023);
10. *Ulmer v. United States*, Nos. 5:20-cr-131, 5:22-cv-328, 2023 WL 4865553 (E.D.N.C. July 31, 2023)
11. *United States v. Jones*, No. 3:23-cr-31, 2023 WL 4850586 (D. Conn. July 28, 2023);
12. *United States v. Day*, No. 5:22-cr-86, 2023 WL 4824728 (S.D.W. Va. July 27, 2023);
13. *United States v. Mosely*, No. 22-cr-620, 2023 WL 4765596 (S.D. Tex. July 26, 2023);
14. *Black v. United States*, No. 3:23-cv-436, 2023 WL 4728839 (W.D.N.C. July 24, 2023);
15. *United States v. Deare*, No. 6:21-cr-212, 2023 WL 4732568 (W.D. La. July 24, 2023);
16. *United States v. Gilbert*, No. 21-cr-110, 2023 WL 4708005 (S.D. Ala. July 24, 2023);
17. *United States v. Harrison*, No. 3:22-cr-455, 2023 WL 4670957 (N.D.N.Y. July 20, 2023);
18. *United States v. Faust*, No. 23-cr-2005, 2023 WL 4626672 (N.D. Iowa July 19, 2023);
19. *United States v. Dobbs*, No. 22-20068, 2023 WL 4596756 (E.D. Mich. July 18, 2023);
20. *United States v. Morgan*, No. 8:23-cr-72, 2023 WL 4562850 (M.D. Fla. July 17, 2023);
21. *United States v. Holmes*, No. 23-20075, 2023 WL 4494340 (E.D. Mich. July 12, 2023);
22. Parks, Jr. v. United States, No. 1:23-cv-80, 2023 WL 4406026 (S.D. Ga. July 7, 2023);
23. *United States v. Ray*, No. 3:21-00057, 2023 WL 4378152 (S.D. W.Va. July 6, 2023);

31

24. *United States v. Mashburn*, No. 22-00190-KD-MU, 2023 WL 4375615 (S.D. Ala. July 6, 2023);

25. *Nicks v. United States*, No. 5:23-cv-2-KDB, (5:20-cr-97-KDB-DCK-1), 2023 WL 4356065 (W.D.N.C. July 5, 2023);

26. *United States v. Keels*, No. 2:23-cr-20085, Dkt. No. 40, 2023 WL 4303567 (E.D. Mich. June 30, 2023);

27. *United States v. Robinson*, No. 3:21-cr-159, 2023 WL 4304762 (N.D. Tex. June 29, 2023);

28. *United States v. Nelson*, No. 2:22-cr-20512, Dkt. No. 42, ____ F.Supp.3d___, 2023 WL 4249367 (E.D. Mich. June 29, 2023);

29. *United States v. Kearney*, No. 4:23-cr-29, 2023 WL 3940106 (E.D. Va. June 9, 2023);

30. *United States v. Gibbs*, No. 2:22-cr-20268, Dkt. No. 50 (E.D. Mich. June 7, 2023);

31. *United States v. Hopkins*, No. 2:22-cr-20448, Dkt. No. 48 (E.D. Mich. June 6, 2023);

32. *United States v. Neely*, No. 2:22-cr-20513, Dkt. No. 27, 2023 WL 3669346 (E.D. Mich. May 25, 2023);

33. *United States v. Haywood*, No. 2:22-cr-20417, Dkt. No. 44, 2023 WL 3669333, (E.D. Mich. May 25, 2023);

34. *United States v. Carter*, No. 2:22-cr-20477, Dkt. No. 51 (E.D. Mich. May 9, 2023);

35. *United States v. Meyer*, No. 22-cr-10012, Dkt. No. 53 (S.D. Fl. May 9, 2023);

36. *United States v. Bluer*, No. 2:22-cr-20557, Dkt. No. 27 (E.D. Mich. May 8, 2023);

37. *United States v. Hazley*, No. 2:22-cr-20612, Dkt. No. 32, 2023 WL 3261585 (E.D. Mich. May 4, 2023);

38. *United States v. Murphy*, No. 22-cr-121, Dkt. No. 42 (N.D. Ill. May 3, 2023);

39. *United States v. Wilkerson*, No. 2:22-cr-152, 2023 WL 3220186, at *3 (E.D. Va. May 2, 2023);

40. *United States v. Taylor*, No. 3:22-cr-20315, Dkt. No. 36 (E.D. Mich. Apr. 26, 2023);

41. *United States v. Mcilwain*, No. 2:23-cr-20012, Dkt. No. 28 (E.D. Mich. Apr. 26, 2023);

42. *United States v. Thomas*, No. 2:23-cr-20036, Dkt. No. 27 (E.D. Mich. Apr. 25, 2023);

43. *United States v. Cummings*, No. 1:22-cr-51, Dkt. No. 49 (N.D. Ind. Apr. 20, 2023);

44. *United States v. Payne*, No. 4:22-cr-173, Dkt. No. 24 (S.D. Tex. Apr. 12, 2023);

45. *United States v. Thompson*, No. 22-cr-173, Dkt. No. 53 (E.D. La. Apr. 7, 2023);

46. *United States v. Guthery*, No. 2:22-cr-173, Dkt. No. 49 (E.D. Cal. Mar. 29, 2023);

47. *United States v. Finney*, No. 2:23-cr-13, Dkt. No. 23 (E.D. Va. Mar. 29, 2023);

48. *United States v. Dixon*, No. 1:22-cr-140, Dkt. No. 76 (N.D. Ill. Mar. 28, 2023);

49. *United States v. Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023);

50. *United States v. Hoeft*, No. 4:21-cr-40163, Dkt. No. 103 (D. S.D. Mar. 21, 2023);

51. *United States v. Davis*, No. 1:23-cr-10018, Dkt. No. 49 (D. Mass. Mar. 17, 2023);

52. *United States v. Rice*, No. 3:22-cr-36, Dkt. No. 40 (N.D. Ind. Mar. 17, 2023);

53. *United States v. Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023);

54. *United States v. Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023);

55. *United States v. Lindsey*, No. 4:22-cr-138, Dkt. No. 25 (S.D. Iowa Mar. 10, 2023);

56. *United States v. Tribble*, No. 2:22-cr-85, Dkt. No. 48 (N.D. Ind. Mar. 10, 2023);

57. *Leonard v. United States*, No. 1:22-cv-22670, Dkt. No. 15 (S.D. Fla. Mar. 10, 2023);

58. *United States v. Therrien*, No. 1:21-cr-10323 (D. Mass. Mar. 6, 2023);

59. *United States v. Price*, No. 1:19-cr-824, Dkt. No. 105 (N.D. Ill. Mar. 3, 2023);

60. *United States v. Belin*, No. 1:21-cr-10040, Dkt. No. 65 (D. Mass. Mar. 2, 2023);

61. *United States v. Clark*, No. 1:20-cr-49, Dkt. No. 61 (N.D. Ind. Mar. 2, 2023);

62. *United States v. Braster*, No. 1:20-cr-66, Dkt. No. 42 (N.D. Ind. Mar. 2, 2023);

63. *United States v. Barnes*, No. 1:22-cr-43, Dkt. No. 42 (S.D.N.Y. Feb. 28, 2023);

64. *United States v. Beard*, No. 4:22-cr-92, Dkt. No. 58 (S.D. Tex. Feb. 27, 2023);

65. *United States v. Smith*, No. 22-cr-20351, Dkt. No. 35, 2023 WL 336136 (E.D. Mich. Feb. 24, 2023);

66. *United States v. Barber*, No. 3:22-cr-65, Dkt. No. 58 (D. Ak. Feb. 21, 2023);

67. *United States v. Ross*, No. 22-cr-20049, Dkt. No. 34 (E.D. Mich. Feb. 15, 2023);

68. *United States v. Price*, No. 1:21-cr-164, Dkt. No. 122 (N.D. Ill. Feb. 13, 2023);

69. *United States v. Gleaves*, No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023);

70. *United States v. Bacchus*, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023);

71. *United States v. Isaac*, No. 5:22-cr-117, Dkt. No. 27, 2023 WL 1415597 (N.D. Ala. Jan. 31, 2023);

72. *United States v. Taylor*, No. 3:22-cr-22, Dkt. No. 32, 2023 WL 1423725 (E.D. Ky. Jan. 31, 2023);

33

73. *United States v. Barber*, No. 4:20-cr-384, Dkt. No. 118, 2023 WL 1073667 (E.D. Tex. Jan. 27, 2023);

74. *United States v. Hester*, No. 1:22-cr-20333, Dkt. No. 39 (S.D. Fla. Jan. 27, 2023);

75. *United States v. Brown*, No. 2:20-cr-260, Dkt. No. 186, 2023 WL 424260 (E.D. Pa. Jan. 26, 2023);

76. *United States v. Rush*, No. 4:22-cr-40008, Dkt. No. 46, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023);

77. *Davis v. United States*, No. 5:22-cv-224, Dkt. No. 1, 2023 WL 373172 (E.D. Ky. Jan. 24, 2023);

78. *Battles v. United States*, No. 4:23-cv-63, Dkt. No. 2, 2023 WL 346002 (E.D. Mo. Jan. 20, 2023);

79. *United States v. Gordon*, No. 1:14-cr-312, Dkt. No. 170, 2023 WL 336137 (N.D. Ga. Jan. 20, 2023);

80. *Shipley v. Hijar*, No. 3:23-cv-11, Dkt. No. 3, 2023 WL 353994 (W.D. Tex. Jan. 20, 2023);

81. *United States v. Smith*, No. 2:19-cr-505, Dkt. No. 183 (C.D. Cal. Jan. 19, 2023);

82. *United States v. Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023);

83. *United States v. Tucker*, No. 2:22-cr-17, Dkt. No. 30, 2023 WL 205300 (S.D. W. Va. Jan. 17, 2023);

84. *United States v. Robinson*, No. 4:22-cr-70, Dkt. No. 39, 2023 WL 214163 (W.D. Mo. Jan. 17, 2023);

85. *United States v. Whittaker*, No. 1:22-cr-272, Dkt. No. 33 (D.D.C. Jan. 12, 2023);

86. *United States v. Spencer*, No. 2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023);

87. *United States v. Garrett*, No. 1:18-cr-880, Dkt. No. 144 (N.D. Ill. Jan. 11, 2023);

88. *United States v. Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL 154588 (D. Or. Jan. 11, 2023);

89. *United States v. Jordan*, No. 3:22-cr-1140, Dkt. No. 39, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023);

90. *Campiti v. Garland*, No. 3:22-cv-177, Dkt. No. 27 (D. Conn. Jan. 10, 2023);

91. *United States v. Coleman*, No. 3:22-cr-8, Dkt. No. 117, 2023 WL 122401 (N.D. W.Va. Jan. 6, 2023);

34

92. *United States v. Medrano*, No. 3:21-cr-39, Dkt. No. 65, 2023 WL 122650 (N.D. W.Va. Jan. 6, 2023);

93. *United States v. Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan. 5, 2023);

94. *United States v. Good*, No. 1:21-cr-180, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022), report and recommendation adopted, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023);

95. *United States v. Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022);

96. *United States v. Jones*, No. 5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022);

97. *United States v. Williams*, No. 1:21-cr-362, 2022 WL 17852517 (N.D. Ga. Dec. 22, 2022);

98. *United States v. Dawson*, No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022);

99. *United States v. Goins*, No. 5:22-cr-91, Dkt. No. 32 (E.D. Ky. Dec. 21, 2022);

100. *United States v. Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022);

101. *United States v. Hunter*, No. 1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022);

102. *United States v. Spencer*, No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022);

103. *United States v. Dotson*, No. 3:22-cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022);

104. *United States v. Tran*, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022);

105. *United States v. Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022);

106. *United States v. Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022);

107. *United States v. Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022);

108. *Shelby-Journey-Egnis v. United States*, No. 2:21-cr-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022);

109. *United States v. Grinage*, No. 5:21-cr-399, Dkt. No. 51, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022);

110. *United States v. Wagoner*, No. 4:20-cr-18, Dkt. No. 262, 2022 WL 17418000 (W.D. Va. Dec. 5, 2022);

111. *United States v. Gay*, No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022);

112. *United States v. Glaze*, No. 5:22-cr-425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022);

113. *United States v. Ford*, No. 4:21-cr-179, Dkt. No. 52, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022);

114. *United States v. Jones*, No. 4:20-cr-354, Dkt. No. 78, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022);

35

115. *United States v. Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022);

116. *United States v. Cage*, No. 3:21-cr-68, Dkt. No. 41, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022);

117. *United States v. Willis*, No. 1:22-cr-186, Dkt. No. 36 (D. Colo. Nov. 23, 2022);

118. *United States v. Teerlink*, No. 2:22-cr-24, Dkt. No. 33, 2022 WL 17093425 (D. Utah Nov. 21, 2022);

119. *United States v. Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022);

120. *United States v. Hill*, No. 4:22-cr-249, Dkt. No. 42 (S.D. Tex. Nov. 17, 2022);

121. *United States v. Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022);

122. *United States v. Mitchell*, No. 1:22-cr-111, Dkt. No. 43 (S.D. Ala. Nov. 17, 2022);

123. *United States v. Dumont*, No. 1:22-cr-53 (D.N.H. Nov. 14, 2022);

124. *United States v. Baker*, No. 2:20-cr-301, Dkt. No. 179, 2022 WL 16855423 (D. Utah Nov. 10, 2022);

125. *United States v. Carpenter*, No. 1:21-cr-86, Dkt. No. 38, 2022 WL 16855533 (D. Utah Nov. 10, 2022);

126. *United States v. Gray*, No. 1:22-cr-247, Dkt. No. 22, 2022 WL 16855696 (D. Colo. Nov. 10, 2022);

127. *United States v. Moore*, No. 2:21-cr-121, Dkt. No. 81 (W.D. Pa. Nov. 9, 2022);

128. *United States v. Reese*, No. 2:19-cr-257, Dkt. No. 193 (W.D. Pa. Nov. 8, 2022);

129. *United States v. Young*, No. 2:22-cr-54, Dkt. No. 47 (W.D. Pa. Nov. 7, 2022);

130. *United States v. Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022);

131. *United States v. Burton*, No. 3:22-cr-362, Dkt. No. 48 (D. S.C. Oct. 28, 2022);

132. *United States v. Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022);

133. *United States v. Grant*, No. 3:22-cr-161, Dkt. No. 44, 2022 WL 16541138 (D. S.C. Oct. 28, 2022);

134. *Walker v. United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022);

135. *United States v. Law*, No. 2:20-cr-341, Dkt. No. 60 (W.D. Pa. Oct. 27, 2022);

136. *United States v. Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022);

137. *United States v. Minter*, No. 3:22-cr-135, Dkt. No. 33 (M.D. Pa. Oct. 18, 2022);

138. *United States v. Melendez-Machado*, No. 3:22-cr-634, Dkt. No. 32, _____ F. Supp. 3d __, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022);

139. *United States v. Raheem*, No. 3:20-cr-61, Dkt. No. 389, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022);

140. *United States v. Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022);

141. *United States v. Trinidad*, No. 3:21-cr-398, Dkt. No. 99, 2022 WL 10067519 (D.P.R. Oct. 17, 2022);

142. *United States v. Carrero*, No. 2:22-cr-30, Dkt. No. 50, 2022 WL 9348792 (D. Utah Oct. 14, 2022);

143. *United States v. Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022);

144. *United States v. Riley*, No. 1:22-cr-163, Dkt. No. 37, 2022 WL 7610264 (E.D. Va. Oct. 13, 2022);

145. *United States v. Price*, No. 2:22-cr-97, _____ F. Supp. 3d __, 2022 WL 6968457 (S.D. W.Va. Oct. 12, 2022);

146. *United States v. King*, No. 7:21-cr-255, Dkt. No. 50, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022);

147. *United States v. Daniels*, No. 1:03-cr-83, Dkt. No. 69, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022);

148. *United States v. Charles*, No. 7:22-cr-154, Dkt. No. 48, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022);

149. *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022);

150. *United States v. Harper*, No. 5:21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022), report and recommendation adopted, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022);

151. *United States v. Campbell*, No. 5:22-cr-138, Dkt. No. 64 (W.D. Okla. Sept. 27, 2022);

152. *United States v. Siddoway*, No. 1:21-cr-205, Dkt. No. 54, 2022 WL 4482739 (D. Idaho Sept. 27, 2022);

153. *United States v. Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022);

154. *United States v. Collette*, No. 7:22-cr-141, Dkt. No. 66, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022);

37

155. *United States v. Delpriore*, No. 3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022);

156. *United States v. Coombes*, No. 4:22-cr-189, Dkt. No. 39, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022);

157. *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022);

158. *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022);

159. *United States v. Cockerham*, No. 5:21-cr-6, Dkt. No. 31 (S.D. Miss. Sept. 13, 2022);

160. *United States v. Jackson*, No. 0:21-cr-51, Dkt. No. 114, 2022 WL 4226229 (D. Minn. Sept. 13, 2022);

161. *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022);

162. *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022);

163. *United States v. Doty*, No. 5:21-cr-21, Dkt. No. 34 (N.D. W.Va. Sept. 9, 2022);

164. *United States v. Burrell*, No. 3:21-cr-20395, Dkt. No. 34, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022);

165. *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022);

166. *United States v. Ingram*, No. 0:18-cr-557, Dkt. No. 1714, __ F. Supp. 3d __, 2022 WL 3691350 (D. S.C. Aug. 25, 2022);

167. *United States v. Nevens*, No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022);

168. *United States v. Farris*, No. 1:22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022);

169. *United States v. Adams*, No. 1:20-cr-628 (S.D.N.Y. Aug. 10, 2022);

170. *United States v. Ramos*, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022);

171. *United States v. Doss*, No. 4:21-cr-74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022);

172. *United States v. Maurice*, No. 7:22-cr-48 (S.D.N.Y. Jul. 14, 2022).